UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COVANTAGE CREDIT UNION,

                    Plaintiff,                              Case Number 21-12559
v.                                                          Honorable David M. Lawson

BLUE CROSS BLUE SHIELD OF
MICHIGAN MUTUAL INSURANCE
COMPANY,

                    Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The plaintiff filed its complaint under the Lanham Act and state law seeking to enjoin the defendant from using certain trademarks incorporating the CoVantage name. The plaintiff also filed a motion for a preliminary injunction. The defendants answered the motion for a preliminary injunction and countered with a motion to dismiss, arguing that the plaintiff has not established standing and therefore the Court lacks subject matter jurisdiction, and the complaint fails to state any viable claims. The Court held an evidentiary hearing on the motion for preliminary injunction December 14, 2021. The motion to dismiss is fully briefed, and oral argument will not assist in its disposition. The Court, therefore, will decide that motion on the papers submitted. E.D. Mich. LR 7.1(f)(2).

The plaintiff has alleged a concrete and imminent injury and has established the other requisites of standing. Therefore, the Court has subject matter jurisdiction over the dispute. The plaintiff also has pleaded viable claims in the complaint and has demonstrated a likelihood of success on the merits of those claims. Balancing the other pertinent factors favors the issuance of

a preliminary injunction preventing the defendant from using the infringing mark.  The motion to dismiss will be denied and the motion for preliminary injunction will be granted.

I.

A.

According to the complaint, plaintiff CoVantage Credit Union has operated under the name "CoVantage" at least since 2000.  Compl., ¶¶ 7-8, ECF No. 1, PageID.2-3.  Today, it offers credit union, banking, business administration, and other services to 135,000 members nationwide through its website, www.covantagecu.org; through mobile banking apps, like MyCoVantage; and in-person at nineteen brick-and-mortar locations across Michigan and Wisconsin, where it is headquartered.  *Id.* at ¶¶ 1, 11-12, PageID.1, 4.  The plaintiff also offers insurance and other financial services to its business members and their employees, as well as Health Savings Accounts, which some members use to pay Medicare Advantage premiums.  *Id.* at ¶¶ 14-15, 47, PageID.6-7, 13.  In addition, since 2016 the plaintiff has operated a charitable arm, the CoVantage Cares Foundation, through which it has provided nearly $2 million in grants.  *Id.* at ¶ 16.

The plaintiff alleges that it has won certain acclaim for these activities.  Credit union industry research firm Callahan & Associates ranked the plaintiff first in the nation for returning value back to members in 2020, S&P Global Market Intelligence has ranked the plaintiff as a top 50 best performing credit union in the country, and Forbes ranked it as the best credit union in Wisconsin in 2021.  *Id.* at ¶ 18.  The plaintiff also extensively advertises under its COVANTAGE marks on television, print, radio, signage, and online channels, to the point, the plaintiff alleges, that people associate it with the term "CoVantage."  *Id.* at ¶¶ 20-21, PageID.7.  At least the first full page of Google search results for the term "covantage" are related to the plaintiff.  *Id.* at ¶ 23.

The plaintiff owns two registered trademarks that include the term COVANTAGE.  It registered the first, COVANTAGE CREDIT UNION, on June 26, 2005 in International Class 36. Registration No. 2,976,076, ECF No. 1-2, PageID.24.  The mark includes an illustration of the word "CoVantage" in large letters above the words "CREDIT UNION" in smaller type and alongside a graphic of two non-concentric half ovals.  *Ibid.*  The "CREDIT UNION" portion of the mark is disclaimed.  *Ibid.*  The plaintiff has used the mark in connection with "credit union services" since December 20, 2000.  *Ibid.*  The plaintiff registered the second mark, COVANTAGE CARES, on September 27, 2016, also in International Class 36.  Registration No. 5,051,308, ECF No. 1-3, PageID.28.  The mark consists of the word "CoVantage" with the letter "V" depicted as a heart above cursive script of the word "cares."  *Ibid.*  The plaintiff uses the mark for "charitable fundraising services" and disclaimed the "CARES" portion of the mark.  *Ibid.*

CoVantage alleges that Blue Cross, knowing about the plaintiff's marks, attempted to register confusingly similar marks designated as COVANTAGE HEALTH PARTNERS & DESIGN and COVANTAGE HEALTH PARTNERS.  The applications expressed an intent to use the marks for holding company services that include business management and administration services for managed care insurance, financial records management, and capital funding.  The applications disclaimed the use of all language except "COVANTAGE."  The plaintiff alleged that Blue Cross's putative marks are confusingly similar to CoVantage's marks and that Blue Cross seeks registration of the marks in the same International Class.  And the plaintiff asserted that Blue Cross was aware of the plaintiff's good will and reputation connected to its COVANTAGE marks, and therefore Blue Cross adopted its similar marks in bad faith.  Finally, the plaintiff alleges that at least some of the services in which the two companies will involve themselves, including health

savings accounts and other financial services, overlap, and that they operate in the same geographical area.

B.

The parties developed additional facts through affidavits and testimony at the preliminary injunction hearing. Sherry Aulik, an executive vice-president at CoVantage, averred that the credit union offers Health Savings Accounts to its business members and their employees. Brett Lee, the credit union's chief retail officer, confirmed that CoVantage offers many kinds of insurance, including auto, home, life, disability, and other insurance plans. Between its credit union and charitable activities, the plaintiff allegedly spends more than $1 million annually advertising services under the two marks.

At the hearing, Lee testified that the plaintiff uses "CoVantage" signage at all of its branch locations. The signage does not include the words "Credit Union" beneath the word "CoVantage." Lee testified that the plaintiff also uses "CoVantage" as a stand-alone term on its mobile application and in periodical advertisements. Lee said that members commonly refer to the plaintiff as "CoVantage."

The plaintiff does not own the mark for the stand-alone term "COVANTAGE." That mark was formerly registered to PacifiCare Life and Health Insurance Company, a UnitedHealth subsidiary, but was canceled on April 10, 2020 due to nonuse. The insurer stopped using the mark when it changed the name of its "CoVantage" business to "ProcessWorks" in 2007. The only other mark incorporating COVANTAGE was registered by Apex Data Services, but its registration was also canceled for nonuse in 2016. No other registered marks currently include the term COVANTAGE. Another credit union has registered VANTAGE CREDIT UNION marks, and

- 4 -

two other credit unions have registered marks that include the term VANTAGE.  Roughly fifteen credit unions have registered marks that include the term ADVANTAGE.

According to Lee, the insurance products offered by the plaintiff through a third-party insurer, TruStage Insurance, include auto, home, life, accidental death and dismemberment, credit, guaranteed asset protection, long-term care, and disability insurance.  TruStage offers health insurance products, although not in partnership with the plaintiff.  But Lee said that there is nothing preventing the plaintiff from partnering with TruStage to offer health insurance in the future and that credit unions commonly offer such services.  Lee also testified that the plaintiff offers health savings accounts to its members.

Lee testified that the plaintiff offers services under its COVANTAGE marks to businesses in the health and managed care industry, including business lending, financial services, and investment capital funding.  The plaintiff offers these services to certain business members that, in turn, offer health insurance and Medicare Advantage Plans.  Lee said that at least one other credit union offers Blue Cross Blue Shield health plans, including a "Blue Advantage" plan.

Lee insisted that, as a credit union, the plaintiff's reputation is vital.  He opined that the defendant's use of COVANTAGE marks jeopardizes the trust the plaintiff long has built with its customers and the control the plaintiff has over its brand.  He admitted that the plaintiff is not licensed to provide Medicare Advantage insurance coverage, does not sell Medicare Advantage coverage, does not provide any expertise regarding how to operate a complaint Medicare Advantage plan, and does not form joint ventures with Blue Cross Blue Shield plans.  And he conceded that, if its members purchase insurance products through CoVantage Credit Union, they must manage their coverage by contacting the plaintiff's third-party insurance partners directly.

However, he also testified that TruStage co-brands insurance products offered in partnership with the plaintiff by using the CoVantage logo.

Lee could not point to any instance of any CoVantage Credit Union members confusing the parties. He is not aware that the plaintiff yet has received any misdirected mail, confusing press coverage, or complaints as the result of the defendant's use of COVANTAGE marks. But he said that the plaintiff has not conducted a survey or study regarding the defendant's use of COVANTAGE marks.

According to Pritpal Virdee, the president of Covantage Health Partners, Inc., Blue Cross's subsidiary, Blue Cross founded Covantage Health in 2019 as a subsidiary of its Emergent Holdings, Inc., business unit. *Id.* at ¶ 2, PageID.512. Covantage Health forms joint ventures with other Blue Cross Blue Shield companies to assist them in forming insurance companies that offer Medicare Advantage insurance plans. Thus far, Covantage Health has formed joint ventures with Blue Cross Blue Shield companies that cover Medicare beneficiaries in Iowa, North Dakota, South Dakota, and Vermont and has marketed similar services to Blue Cross Blue Shield plans in other states. Although it owns stakes in these plans, Covantage Health does not itself offer any insurance plans under the COVANTAGE HEALTH PARTNERS mark. Rather, Covantage Health provides "back office services" to other Blue Cross Blue Shield plans. Those services include claims management, eligibility, enrollment, pharmacy services, financial management, and compliance services. Virdee averred that Covantage Health has no plans to market its services in Michigan or Wisconsin. Blue Cross offers Health Savings Accounts but not through Covantage Health.

On November 1, 2019, Blue Cross applied to register two COVANTAGE HEALTH PARTNERS marks. The first mark includes a design that consists of the word "Covantage" in larger type above the words "Health Partners" in smaller type, with a stylized, lower-case letter

"v".  The second is a standard character mark for COVANTAGE HEALTH PARTNERS.  The defendant seeks to use the marks in International Class 36 for "[p]roviding financial management services for others in the health and managed care insurance industries" and "providing investment capital funding for others in the health and managed care insurance industries."  It also intends to use the marks in International Class 35 for "[h]olding company services, namely, business management and business administration services for others in the health and managed care insurance industries" and "providing financial records management for others in the health and managed care insurance industries."  Its applications initially were denied due to the likelihood of confusion with PacifiCare's COVANTAGE mark.  The refusal statements noted that the defendant's marks and PacifiCare's marks all used the term COVANTAGE and that, as a result, "[c]onsumers would be likely to believe the services connected with both of these marks originate from the same source because the overall consumer protection of the wording COVANTAGE is confusingly similar when used in connection with related services."  However, the Trademark Office did not mention the plaintiff's registered marks.

Virdee said that Blue Cross decided to use the term "covantage" in its subsidiary's name because it combines the words "confident" and "advantage."  Blue Cross uses the COVANTAGE HEALTH PARTNERS marks on its Emergent Holdings website.  The website is promotional; no products or services can be purchased through it.  The only button on the page is a "Contact Us" button, which redirects to a third wholly-owned subsidiary, Advantasure.  Advantasure provides enterprise web-based technologies to health care payors.

Virdee opined that Medicare beneficiaries never would encounter the Covantage Health Partners brand in the marketplace, because the defendant does not actually sell any insurance products or offer any services directly to beneficiaries.  He also denied that Covantage Health was

involved in the lending business, licensed to operate as a credit union, or offered health savings accounts.

Virdee claimed that the defendant invested an extensive amount of time selecting the Covantage Health brand name and researching different names, and that it came to the term "covantage" because it combined the words "confident" and "advantage."  He asserted that the company performed legal checks to evaluate whether it could trademark the Covantage brand and would not have chosen a name that could have been confused with another company.

Virdee said that he thought the defendant would be harmed if it had to stop using its COVANTAGE marks because it has built up its Covantage Health brand over two-and-a-half years to establish a strong reputation in the marketplace.  He also testified that it would be difficult and time-consuming to clear a new name, including because the defendant would have to refile all of its licensing and regulatory applications.  However, he conceded that Covantage Health thus far has formed only three joint partnerships that provide services, which included regulatory compliance and underwriting.

Despite the "extensive research" the defendant conducted into the branding, Virdee said that he never had heard of CoVantage Credit Union before this litigation and is not aware that any Covantage Health partner has ever confused the two entities.  However, Virdee admitted on cross-examination that he was aware of the plaintiff's COVANTAGE marks by the time the defendant applied to register its COVANTAGE marks.

Virdee conceded that the defendant uses its COVANTAGE marks on websites that also display other marks for the defendant's Emergent Holdings and Advantasure brands, and that the latter entity also consults with Medicare Advantage plans to provide services.  He conceded that the defendant does not have a Covantage Health Partners domain name, despite stating in its

motion response that one of the reasons it would be so costly to establish new marks would be because it would need to register a new domain and create a new look and feel for its website.  He also admitted that the defendant thus far has spent only $2,000 or $3,000 on promotional materials and office supplies bearing the Covantage Health mark.  And he acknowledged that the defendant has taken no steps to select or clear a new name since the plaintiff sent it a cease-and-desist letter in May 2021.  Finally, he acknowledged that the only other live federal trademark registrations that include the term COVANTAGE are those owned by the plaintiff.

C.

The U.S. Patent and Trademark Office (USPTO) ultimately published the defendant's trademark applications for opposition on May 18, 2021.  Plaintiff's counsel reached out to defense counsel around that date.  Blue Cross alleges that it provided "a proposal to resolve the matter," but the plaintiff did not respond.   The plaintiff filed an opposition against the defendant's application on June 9, 2021.

On July 23, 2021, CoVantage filed a complaint in the United States District Court for the Eastern District of Wisconsin pleading trademark infringement and unfair trade practice claims.  Finding the court lacked personal jurisdiction over the defendant, the court dismissed the case instead of transferring it.  *CoVantage Credit Union v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*, No. 1:21-cv-00867, 2021 WL 4991321, *4-5 (E.D. Wis. Oct. 27, 2021).

The plaintiff filed a similar complaint in this district on October 29, 2021, pleading claims for (1) federal trademark infringement, (2) federal unfair competition and false designation, (3) unfair competition under Michigan law, and (4) trademark infringement under Michigan law.  It also asked the Court to cancel the defendant's trademark applications.

On November 3, 2021, the plaintiff filed the motion for a preliminary injunction, asking the Court to enjoin the defendant from using its COVANTAGE HEALTH PARTNERS marks while its trademark infringement suit is pending.  The defendant's trademark applications were suspended when the plaintiff filed its first civil suit and have not been reopened.

Blue Cross filed its motion to dismiss arguing lack of subject matter jurisdiction and failure to state a claim.  It later filed counterclaims seeking a declaratory judgment that it has not infringed upon the plaintiff's trademark rights.

## II.

Blue Cross invokes Federal Rule of Civil Procedure 12(b)(1) and argues that there is no case or controversy ripe for resolution because the plaintiff's complaint is based on speculation about future events.  It contends, despite its filing an intent-to-use trademark application, that the complaint does not plausibly allege that the defendant's *current* use of COVANTAGE marks constitutes actionable infringement, only that the defendant *might* make infringing use of such marks.  It also argues that there is no actual or imminent controversy because the only potential customers of Covantage Health services are a narrow set of insurance companies, so there is no prospect of other consumers confusing the parties' marks.

A motion under Rule 12(b)(1) may be brought as a facial attack — that is, a challenge to the sufficiency of the complaint — or a factual attack — taking in evidence beyond the pleadings. *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). For the latter, courts have "wide discretion" to consider affidavits and documents "to arrive at the factual predicate that subject-matter [jurisdiction] does or does not exist." *Gentek Bldg. Prods.*, 491 F.3d at 330.  The Court also may consider the evidence from the preliminary injunction hearing and take judicial notice of its own records.  *See* Fed. R. Evid. 201(b)(2); *United States v. Doss*, 563 F.2d 265, 269 n.2 (6th

Cir. 1977).  The plaintiff has the burden to prove the jurisdictional facts, *Cartwright*, 751 F.3d at 760, and all parties have had the opportunity to present evidence on that issue.  The Court "has the power to weigh [that] evidence and determine the effect of that evidence on the court's authority to hear the case." *Id*. at 759-60.

A challenge based on ripeness can implicate at least two justiciability questions: whether a "Case or Controversy" exists within the meaning of Article III of the Constitution, and whether the plaintiff has standing to pursue the claim. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997).  "Ripeness requires that the injury in fact be certainly impending." *Id*. at 280 (internal quotation marks and citation omitted); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 190 (2000).  One feature of standing is that the plaintiff demonstrate "actual present harm or a significant possibility of future harm." *Magaw*, 132 F.3d at 279; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that Article III gives claimants standing to file a lawsuit in federal court if they establish injury, causation, and redressability).  Those issues tend to meld together when the ripeness challenge, as here, is based on the real-versus-hypothetical nature of the threatened injury. *Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 537-38 (6th Cir. 2011), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ("Indeed if a defendant's 'ripeness arguments concern only' the 'requirement that the injury be imminent rather than conjectural or hypothetical' then 'it follows that our analysis of [the defendant's] standing challenge applies equally and interchangeably to its ripeness challenge.'" (quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp*., 462 F.3d 219, 225 (2d Cir. 2006)); *see also Duke Power Co. v. Carolina Envtl. Study Grp., Inc*., 438 U.S. 59, 81 (1978) ("To the extent that issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' our conclusion that appellees will sustain immediate injury . . . and that such

injury would be redressed by the relief requested would appear to satisfy this requirement." (internal quotation marks omitted)); *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975) ("The standing question . . . bears close affinity to questions of ripeness — whether the harm asserted has matured sufficiently to warrant judicial intervention . . . ").

The allegations in the complaint and the evidence presented demonstrate a live controversy that derives from the defendant's present use of the COVANTAGE marks. The complaint clearly alleges that the defendant currently uses its marks in commerce, that the defendant displays COVANTAGE marks on its Emergent Holdings website, and that this use has caused the plaintiff injury. *See* Compl., ¶¶ 35-36, 51-55, ECF No. 1, PageID.10-14. It also alleges that the defendant is selling services under COVANTAGE HEALTH PARTNERS marks, actively infringing on the plaintiff's COVANTAGE marks. *Ibid.* Accusing a party of "infringing a valid trademark . . . is the hallmark of an actual controversy." *Green Edge Enterprises, LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1302 (Fed. Cir. 2010); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (finding that allegations of lost sales and damage to business reputation conferred Article III standing to bring a Lanham Act claim); *Robin Prod. Co. v. Tomecek*, 465 F.2d 1193, 1195 (6th Cir. 1972) ("[A] justiciable controversy is made out upon plaintiff's showing of 'any indirect or implicit or covert charge [of infringement] or threat [of suit or] . . . any conduct or course of action from which any charge or threat could be inferred.'" (quoting *Goodrich-Gulf Chemicals, Inc. v. Phillips Petroleum Co.*, 376 F.2d 1015, 1019 (6th Cir. 1967)); *Cap. Grille Holdings, Inc. v. Historic Hotels of Nashville, LLC*, 448 F. Supp. 3d 819, 826 (M.D. Tenn. 2020) ("Therefore, because Plaintiff has alleged that its trademarks have nationwide priority, and that Defendant is currently using its marks, it has alleged an injury-in-fact that is concrete and actual."). That precisely is what the plaintiff does in its complaint.

- 12 -

Although the complaint also includes a number of allegations that the defendant will use COVANTAGE marks in the future, those allegations do not negate the plaintiff's allegations that the defendant is using the marks now. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."). Nor are allegations regarding planned use irrelevant to the question of the Court's jurisdiction. Numerous courts have exercised jurisdiction over trademark infringement claims based on a defendant's plans to enter a market, for example because a defendant has taken significant steps toward infringement or invested significant sums to develop infringing marks. *See Cap. Grille Holdings*, 448 F. Supp. 3d at 827 (collecting cases).

Blue Cross argues that *Geisha, LLC, v. Tuccillo*, 525 F. Supp. 2d 1002, 1015 (N.D. Ill. 2007), and *Bruce Winston Gem Corp. v. Harry Winston, Inc*., No. 09-7352, 2010 WL 3629592, at *5 (S.D.N.Y. Sep. 16, 2010), stand for the proposition that merely filing an intent-to-use application with the U.S. Patent and Trademark Office does not create a case or controversy. But CoVantage accused Blue Cross of more than that. It alleges, and the evidence confirms, that Blue Cross is already using the COVANTAGE marks. *Geisha* and *Bruce Winston* also are distinguishable because the plaintiffs there sought declaratory relief, and the district court's exercise of discretion in each case was discretionary. *See Geisha*, 525 F. Supp. 2d at 1010 (citing *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987)); *Bruce Winston*, 2010 WL 3629592 at *6 (citing *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992)). CoVantage does not base its claim here solely on the Declaratory Judgment Act.

Blue Cross also relies on *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055 (7th Cir. 1995), but that case also is distinguishable. It concerned an appeal from the denial of a

preliminary injunction motion where the district court found little likelihood of confusion and the defendant pleaded a fair-use defense based on the descriptive nature of the marks in question ("sweet-tart"). *Id.* at 1057-59.  In that context, the Seventh Circuit refused to consider whether the juice company Ocean Spray would hypothetically infringe on Sunmark's trademark for SweeTart candies if Ocean Spray decided to market its new Ocean Spray candies by using the descriptive term "sweet-tart." *Id.* at 1060.  Notably, however, the court of appeals did not find that it lacked jurisdiction to consider Sunmark's infringement claim — only that a preliminary injunction was unwarranted in that case.

The defendant's contention that the plaintiff can no more than hypothesize about how the defendant will use COVANTAGE marks is belied by the defendant's acknowledgement that it actively is using COVANTAGE marks and has done so for more than two years.  Answer, ¶ 8, ECF No. 34, PageID.1149.  Pritpal Virdee swore in a declaration that, "[u]nder its COVANTAGE HEALTH PARTNERS brand, [Covantage Health] offers services to assist insurance companies" and already has formed three joint ventures with other Blue Cross Blue Shield plans.  Pritpal Virdee Decl., ¶¶ 6-7, ECF No. 21-2, PageID.513-14.  He further stated that Covantage Health "directly advertis[es] its services to other Blue Cross and Blue Shield companies" and "provides Medicare Advantage-related services." *Id.* at ¶¶ 11-12, PageID.515.  Moreover, due to the "substantial time and resources" the defendant has expended "promoting the services offered under its COVANTAGE HEALTH PARTNERS trademark," Virdee declares that the defendant would suffer "substantial costs" that would be "catastrophic" to its business if it was enjoined from using its COVANTAGE marks. *Id.* at ¶¶ 15-18, PageID.516-17.  There is nothing hypothetical about the defendant's use of COVANTAGE marks.

The defendant also argues that there is no factual predicate for subject-matter jurisdiction because there is no likelihood that customers will confuse the parties' services, and the plaintiff thus cannot allege an actual or imminent risk of harm. This attack implicates a merits argument not a jurisdictional one. The Court will address that argument later. *See Gentek*, 491 F.3d at 330 (6th Cir. 2007).

The plaintiff's trademark infringement and unfair competition claims create a case in controversy ripe for judicial review.

III.

CoVantage seeks a preliminary injunction that prevents the defendant and its subsidiaries from using the Covantage name in its marks. The Lanham Act authorizes the Court to grant injunctions "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116(a). Courts considering such a request balance four factors, the first and most important of which is the plaintiff's likelihood of success on the merits. *Winnett v. Caterpillar, Inc*., 609 F.3d 404, 408 (6th Cir. 2010). In fact, as amended by the Trademark Modernization Act of 2020, the statute provides that a plaintiff seeking a preliminary injunction "shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits." 15 U.S.C. § 1116(a); *see also DaimlerChrysler v. The Net Inc*., 388 F.3d 201, 208 (6th Cir. 2004) (finding that irreparable harm is "presumed" upon a showing that a defendant infringed a plaintiff's mark). That factor subsumes the issues raised in Blue Cross's motion to dismiss, so the Court will consider those arguments here.

The remaining three factors are whether the plaintiff would suffer irreparable injury without the injunction, substantial harm to others that the inunction might cause, and whether the

injunction would serve the public interest. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citation omitted).

## A. Likelihood of Success

To state a claim under the Lanham Act, for trademark infringement, the plaintiff must establish that "(1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." *Hensley Mfg. v. ProPride, Inc*., 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)). The Lanham Act also prohibits other forms of unfair competition, including falsely designating the origin of goods or services. *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). That claim requires proof of two elements: that the false designation has a substantial economic effect on interstate commerce, and again a likelihood of confusion. *Id.* at 502 (citing *Lyon v. Quality Courts United, Inc*., 249 F.2d 790, 795 (6th Cir. 1957)). The test for trademark infringement and unfair competition in CoVantage's state law claims "is the same as the tests for federal trademark infringement and federal unfair competition" under the Lanham Act. *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 502 F.3d 504, 521 (6th Cir. 2007) (holding that Michigan statutory and common law uses the same likelihood-of-confusion test for trademark infringement as under federal law); *Janet Travis, Inc. v. Preka Holdings, L.L.C*., 306 Mich. App. 266, 275, 856 N.W.2d 206, 215 (2014) (same). For all these claims, the key element is the likelihood of confusion. *Leelanau Wine Cellars*, 502 F.3d at 515 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr*., 109 F.3d 275, 280 (6th Cir. 1997)).

In this circuit, courts weigh the so-called *Frisch* factors to determine the likelihood of confusion that similar marks might cause to the relevant consumers of the products or services offered by the parties. *Homeowners Group v. Home Mktg. Specialists, Inc*., 931 F.2d 1100, 1107 (6th Cir. 1991). Those are the "(1) strength of the plaintiff's mark; (2) relatedness of the goods;

(3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985); *see also Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 380 (6th Cir. 2006). "[A] plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Am. Way Serv. Corp. (Wynn Oil II)*, 943 F.2d 595, 600 (6th Cir. 1991) (quoting *Wynn Oil Co. v. Thomas (Wynn Oil I)*, 839 F.2d 1183, 1186 (6th Cir. 1988)).

Balancing the *Frisch* factors favors CoVantage. Two of the most important *Frisch* factors weigh in its favor: its marks are very strong and the parties' marks are similar. There is also at least circumstantial evidence that Blue Cross intended to copy the plaintiff's marks. These factors suggest that CoVantage is likely to succeed on the merits of its case, even though other factors weigh in the defendant's favor.

## 1. Strength of Marks

"The strength of a mark is a factual determination of the mark's distinctiveness." *Daddy's Junky Music Stores*, 109 F.3d at 280. The stronger the mark, the greater the protection it enjoys, *Champions Golf Club, Inc. v. The Champions Golf Club, Inc*., 78 F.3d 1111, 1117 (6th Cir. 1996) (quoting *Hindu Incense v. Meadows*, 692 F.2d 1048, 1050 (6th Cir. 1982)), because the more likely it is that encroachment will produce confusion, *ibid.* (citing *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987)). A mark is strong and distinctive when it is unique, has received intense advertisement, or both. *Daddy's Junky*, 109 F.3d at 280 (quoting *Frisch's Restaurant*, 759 F.2d at 1264).

In assessing strength, marks generally are categorized as fanciful, arbitrary, suggestive, or descriptive. *Ibid.* The term COVANTAGE is a fanciful mark, that is, a mark whose combination of letters or symbols signifies "nothing other than the product or service to which the mark has been assigned." *Little Caesar Enterprises*, 834 F.2d at 571. Because fanciful marks are the strongest marks, this factor weighs in favor of the plaintiff. *Ibid.*

The plaintiff also contends that its marks are strong because other entities do not use trademarks containing the term "covantage." Technically, that is true. But as Blue Cross observes, another health insurance company, PacifiCare, owned the COVANTAGE mark until last year, and other credit unions have marks that include the term "advantage," "vantage," or similar terms. Extensive third-party use of a trademark substantially weakens the strength of a mark only if third-party marks are "actively used in commerce;" the mere existence of third-party marks does not "materially affect the distinctiveness of another's mark." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc*., 931 F.2d 1100, 1108 (6th Cir. 1991) (citing *Amstar Corp. v. Domino's Pizza, Inc*., 615 F.2d 252, 260 (5th Cir. 1980)). Here, records submitted by the plaintiff suggest that PacifiCare has not used its COVANTAGE mark since 2007, and USPTO registry confirms that PacifiCare's registration was canceled for non-use. Registration No. 1,977,319, ECF No. 9-4, PageID.162; Web Archive, ECF No. 9-5, PageID.166. Other credit unions appear to be actively using "vantage" in their name, *see* Third-Party Websites, ECF No. 21-12, PageID.719-80, three of which have registered related marks, *see* Vantage Record Search, ECF No. 21-10, PageID.559. Although "vantage" may be "used persuasively in the marketplace," "the unit of analysis in considering the strength of the mark is the entire mark, not just a portion of the mark." *AutoZone, Inc. v. Tandy Corp*., 373 F.3d 786, 795 (6th Cir. 2004). Because Blue Cross has not demonstrated that "covantage" is used specifically and widely in the marketplace, it "has failed to overcome the

presumption" that the plaintiff's marks are strong.  *Ibid.*; *see also Howeowners,* 931 F.2d at 1108 ("to be accorded weight a defendant must show what actually happens in the marketplace.").

CoVantage argues that its marks are strong for an additional reason: because it has invested substantial time, money, and resources in marketing, advertising, and promoting them.  Blue Cross contests this assertion, arguing that the plaintiff's reputation is niche and regional at best.  But Blue Cross has put forward no evidence and only cites *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632 (6th Cir. 2002), in support of this argument.  In *Therma-Scan*, however, the plaintiff engaged in no advertising whatsoever under its descriptive mark.  *Ibid.*  In contrast, the present plaintiff spends $1 million a year to promote its fanciful mark.  Although advertising budgets may offer only "an attenuated link to actual market recognition," *Homeowners*, 931 F.2d at 1108, CoVantage has also put forward evidence of industry recognition and leadership.  That, combined with its substantial advertising efforts, is enough to establish that the plaintiff's marks are both conceptually and commercially strong.  *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 265 (6th Cir. 2021) (quoting *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 427 (6th Cir. 2017)).

### 2.  Relatedness of Services

There are three categories of relatedness cases: "(1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely." *Homeowners*, 931 F.2d at 1108.  The parties' services are neither similar nor directly competitive, and the plaintiff does not argue otherwise.  *Compare id.* at 1109 (finding that advertising support services for real estate brokers and real estate brokerage services were neither similar nor directly competitive) *with*

*PACCAR Inc. v. TeleScan Techs., L.L.C.,* 319 F.3d 243, 251 (6th Cir. 2003) (finding two used truck location databases to be closely related and directly competitive), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

Services are "related" if they are "marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners*, 931 F.2d at 1109.  Simply "coexist[ing] in the same broad industry" is not enough.  *Ibid.*  Thus, courts have found that the provision of thermal-imaging services is unrelated to the manufacture of thermometers, *Therma-Scan*, 295 F.3d at 633; and the sale of golf equipment featuring a toucan to be unrelated from the sale of cereal featuring Toucan Sam, *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624-25 (2003).  In contrast, the sale of bulk car wax was related to the sale of car washing services, *Wynn Oil I*, 839 F.2d at 1187; sit-down pizza restaurants was related to carry-out pizza restaurants, *Little Caesar*, 834 F.2d at 571; the sale of high-end distilled spirits was related to the sale of lower-price spirits, *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 423 (6th Cir. 2012); and the sale of merchandise bearing the Audi symbol was related to the sale of Audis, *Audi AG v. D'Amato*, 469 F.3d 534, 543 (6th Cir. 2006).  What distinguishes the latter cases from the former is that a consumer easily could believe that a single company sold the products or services at issue.  That risk is diminished here, because no credit union member would believe that their credit union was selling them a joint venture to help sell a Medicare Advantage plan.  Moreover, the defendant exclusively markets its joint ventures to other Blue Cross Blue Shield plans.

Even if a Medicare Advantage plan supported by the defendant hypothetically was paid for from the plaintiff's Health Savings Accounts, that still would not be enough for the services to be related.  "Just because there is some overlap between the two services, it does not follow that the

companies compete directly for the same base of customers." *Progressive*, 856 F.3d at 432.  And

such an overlap would not occur in any case, because the defendant does not offer insurance plans

under the COVANTAGE HEALTH PARTNERS mark.  This factor therefore weighs in the

defendant's favor.

### 3.  Similarity of Marks

"Similarity of marks is a factor of considerable weight." *Daddy's Junky*, 109 F.3d at 283

(citing *Champions Golf Club*, 78 F.3d at 1119).  Courts examine the pronunciation, appearance,

and verbal translation of marks to analyze their similarity.  *Ibid.* (citing *Wynn Oil I*, 839 F.2d at

1188).  They must also determine "whether a given mark would confuse the public when viewed

alone," and not compare the marks side-by-side.  *Ibid.* (citations omitted).  Finally, "courts must

view marks in their entirety and focus on their overall impressions, not individual features." *Ibid.*

(citing *Homeowners Group*, 931 F.2d at 1109).  That said, the addition of weak and nondistinctive

terms does little to reduce confusion, particularly where the dominant portions of a mark are

similar.  *Ibid.* (citing *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir.

1984)); *see also* 4 McCarthy on Trademarks and Unfair Competition § 23:44 (5th ed.) ("If the

'dominant' portion of both marks is the same, then confusion may be likely, notwithstanding

peripheral differences.").

The parties' marks are similar to one another.  All four marks share the dominant term

"Covantage," which is pronounced identically for each mark.  Although the plaintiff capitalizes

the letter "v" in its marks and the defendant does not, this minor difference in spelling and

appearance is "slight and unlikely to prevent confusion," *Induct-O-Matic*, 747 F.2d at 362,

particularly because the defendant emphasizes the "v" in its design mark, App. No. 88,677,253,

ECF No. 9-6, PageID.168.  All three design marks also display the term "Covantage" in a large

font size above disclaimed language in a smaller font. That formatting suggests that the phrase "Covantage" is "not merely a *component* of the . . . marks: it *is* the marks." *See Daddy's Junky*, 109 F.3d at 283. So does the parties' use of their marks, which both abbreviate to COVANTAGE. 4 McCarthy § 23:50 ("The common propensity to abbreviate terms can contribute to a finding of likely confusion when parties drop qualifying words, leaving only the confusingly similar root terms."). Although "it is not proper to dissect a mark," it is clear that the "Covantage" portions of the marks are "more significant" and therefore must be given "greater force and effect." *Id.* at § 23:44.

This is not a case where the defendant merely added matter to the plaintiff's mark. *See, e.g.*, *Daddy's Junky*, 109 F.3d at 283 (assigning more weigh to the term "Daddy's" when comparing the marks "Daddy's" and "Big Daddy's Family Music Center"); *Atlas Trucking*, 998 F.3d at 267 (assigning more weight to the dominant term "Atlas" when comparing the marks "Atlas" and "Atlas Logistics"); *CFE Racing Prod., Inc. v. BMF Wheels, Inc*., 793 F.3d 571, 592 (6th Cir. 2015) (assigning more weight to the dominant term "BMF" when comparing the marks "BMF" and "BMF Wheels"). And there are some differences between the parties' marks. *See Leelanau Wine Cellars*, 502 F.3d at 517 (finding that visual dissimilarities distinguished two marks). The plaintiff's design marks include symbols — the open half ovals in the COVANTAGE CREDIT UNION mark and the heart in the COVANTAGE CARES mark — while the defendant's design marks do not. Similarly, the disclaimed portion of each mark must also be considered, albeit with less weight. *See Homeowners*, 931 F.2d at 1109 (distinguishing two marks with the dominant term "HMS" where one also included the words "home marking specialists"); *In re Detroit Athletic Co*., 903 F.3d 1297, 1304 (Fed. Cir. 2018) (finding that disclaimed language must be considered in the confusion analysis because the public does not know it is disclaimed). These

differences may mitigate confusion, although not enough to outweigh the substantial similarities between the marks; "exact similitude is not required." *McLean v. Fleming*, 96 U.S. 245, 253 (1877).   It is the dominant term COVANTAGE — and not the disclaimed language in each mark — that individuals with a "general, vague, or even hazy, impression or recollection" of the marks are likely to recall, *Wynn Oil I*, 839 F.2d at 1188.  This factor weighs in the plaintiff's favor.

### 4.  Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil I*, 839 F.2d at 1188.  "Due to the difficulty of securing evidence of actual confusion," however, "a lack of such evidence is rarely significant."  *Daddy's Junky*, 109 F.3d at 284. Conversely, "the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks" may even weigh against a finding that confusion is likely.  *Homeowners Group*, 931 F.2d at 1110.

The plaintiffs do not allege actual confusion, and the defendant has only recently begun to use its COVANTAGE marks.  This factor is therefore neutral.

### 5.  Marketing Channels Used

Relevant here are "the similarities or differences between the predominant customers of the parties' respective goods or services." *Daddy's Junky*, 109 F.3d at 285.  The Court also must "determine whether the marketing approaches employed by each party resemble each other." *Ibid.* "[I]f the services of one party are sold through different marketing media in a different marketing context than those of another seller," then the likelihood of confusion is relatively low. *Homeowners*, 931 F.2d at 1110.

There are significant dissimilarities between the parties' predominant customers in the present case.  The defendant markets and sells its COVANTAGE products exclusively to other

Blue Cross Blue Shield plans.  It does not market these services to individuals and small businesses generally.  Moreover, it does not market these services in either Michigan or Wisconsin, where the majority of the plaintiff's members are based.  There is not another Blue Cross Blue Shield plan in Michigan for the defendant to form a joint Medicare Advantage venture, nor does it have any plans to market its services in Wisconsin.  Therefore, there is no marketing overlap, and this factor weighs in favor of the defendant.

### 6.  Degree of Purchaser Care

When a buyer is sophisticated or has special expertise, or the services he is buying are expensive or unusual, then the buyer can be expected to exercise greater care and the likelihood of confusion is diminished.  *Homeowners*, 931 F.2d at 1111.  Here, the defendant's only buyers are highly-sophisticated health insurance plans, and the services they purchase — assistance in standing up Medicare Advantage plans — is both expensive and unusual.  This weighs in the defendant's favor and against a finding of potential confusion.  *See ibid.*  However, as the plaintiff notes, there nevertheless is a possibility that its members may be lured to the defendant's subsidiary's website due to the similarity of the defendant's Covantage Health mark.  Such "initial interest confusion" is actionable even if customers never buy the defendant's services, which they would never do here.  *PACCAR*, 319 F.3d at 254; *see also Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002), *as amended* (Oct. 18, 2002).  Initial interest confusion afflicts both sophisticated and unsophisticated buyers, *see Daddy's Junky*, 109 F.3d at 286, and neither party has demonstrated that the plaintiff's buyers use a high degree of care.

Ultimately, the weight of this factor depends on the similarity of the marks at issue.  *Ibid.* "[I]f marks are similar . . . 'then purchaser care will decrease the likelihood of confusion only

minimally.'" *PACCAR*, 319 F.3d at 254 (quoting *Daddy's Junky*, 109 F.3d at 286). Because the parties' marks are similar, this factor weighs in favor of the plaintiff as well.

### 7. Intent in Selecting Mark

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners*, 931 F.2d at 1111 (citing *Wynn Oil I*, 839 F.2d at 1189). "Direct evidence of intentional copying is not necessary to prove intent." *Daddy's Junky*, 109 F.3d at 286 (citing *Wynn Oil II*, 943 F.2d at 603). Rather, use of a contested mark with knowledge of the protected mark, or in the face of extensive advertising and long-term use of a protected mark, can support a finding of intentional copying.

Blue Cross's Virdee said that he had not heard of CoVantage Credit Union before this litigation, but he admitted that he was aware of the plaintiff's COVANTAGE marks by the time Blue Cross applied to register its COVANTAGE marks. And there is circumstantial evidence that the defendant knew of the plaintiff's marks: the plaintiff had used the marks widely for two decades, and spent $1 million a year promoting services under them. Such evidence only slightly supports a finding of intentional copying. *Daddy's Junky*, 109 F.3d at 286-87. This factor at best weighs only weakly in the plaintiff's favor. At worst, it is neutral: "[i]ntent . . . is an issue whose resolution may benefit only the cause of a senior user, not of an infringer," because "the *lack* of intent by a defendant is 'largely irrelevant in determining if consumers likely will be confined as to source.'" *Id.* at 287 (quoting *Wynn Oil I,* 839 F.2d at 1189). That the USPTO examining attorney reviewed and approved the defendant's marks therefore does not and could not tilt this factor in favor of the defendant.

### 8. Likelihood of Expansion

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners*, 931 F.2d at 1112. There is no evidence that the defendant will expand its Covantage Health business into credit union services, nor any evidence that the plaintiff intends to provide services related to establishing Medicare Advantage plans. Therefore, this factor weighs in favor of the defendant.

* * *

The plaintiff's ownership of registered COVANTAGE trademarks is undisputed and clearly established by the record. It is beyond dispute that the defendant has used its mark in commerce; the plaintiff alleges in its complaint that the defendant actively is selling services under COVANTAGE marks and using the marks on its subsidiary's website. And, as discussed above, consideration of the *Frisch* factors, on balance, easily demonstrates that the plaintiff has stated viable claims in its complaint. The plaintiff has stated claims for which relief can be granted so as to defeat Blue Cross's motion to dismiss brought under Rule 12(b)(6), and moreover it has established a likelihood of success on those claims.

### B. Irreparable Injury

Because CoVantage has established that there is a likelihood of confusion, it is entitled to a presumption of irreparable harm. *See* 15 U.S.C. § 1116(a); *DaimlerChrysler*, 388 F.3d at 208.

CoVantage argues that, even without that presumption, it has nevertheless demonstrated that it will suffer irreparable harm in the form of lost goodwill and damage to its reputation. But it has not offered evidence of that, and it has not cited authority suggesting that the potential loss of goodwill alone is sufficient to demonstrate irreparable harm in the context of a trademark

infringement case.  *Tri-Cnty. Wholesale Distribs. v. Wine Grp., Inc*., 565 F. App'x 477, 483 (6th Cir. 2012), which it cites, does not deal with the Lanham Act or common law trademark infringement.  But because of the presumption, this factor favors the plaintiff.  *See, e.g.*, *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) ("[A] court need only find that a defendant is liable for infringement or unfair competition for it to award injunctive relief."); *Wynn Oil II*, 943 F.2d at 608 (collecting cases); *Larco Bros., Inc. v. Luca's Chophouse, LLC*, 621 F. Supp. 2d 466, 474 (E.D. Mich. 2008) (finding no irreparable harm where the plaintiff failed to establish a likelihood of confusion).

### C.  Injury to Others

In determining whether injunctive relief would cause harm to others, courts look to whether an injunction "would only maintain the status quo," without placing "any other party, in a worse position than they were in before the injunction." *Tri-Cty. Wholesale,* 565 F. App'x at 483 (internal quotations omitted).  Thus, the Sixth Circuit has found a risk of substantial harm in a trademark infringement case where the defendant would be forced to change its name after developing and advertising its brand.  *Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A., LLC*, 245 F. App'x 456, 460 (6th Cir. 2007); *see also Big Time Worldwide Concert & Sport Club at Town Ctr., LLC. v. Marriott Int'l*, 236 F. Supp. 2d 791, 808 (E.D. Mich. 2003) (same); *Nedschroef Detroit Corp. v. Bemas Enterprises LLC*, 106 F. Supp. 3d 874, 891 (E.D. Mich. 2015), *aff'd,* 646 F. App'x 418 (6th Cir. 2016) (finding balance of hardships favored the plaintiff where the defendant's business under challenged marks constituted only a small percentage of its business). The defendant has not made that showing here, however.  Blue Cross asserts that it has expended time and resources promoting services under its COVANTAGE mark, but it has made no effort to quantify this investment.  It has not spent much promoting their mark, and Covantage Health has formed ventures with only three entities.  Blue Cross does not even have its own Covantage Health

- 27 -

Partners website, but rather provides information about Covantage Health on the website of a different subsidiary, which in turn links to a third sub-organization. There is little in the record to suggest that the defendant would face any difficulty in changing Covantage Health's name.

### D. Public Interest

It is "in the public's interest to issue the injunction in order to prevent consumers from being misled." *Audi AG*, 469 F.3d at 550. Because the plaintiff has shown that there is a likelihood that consumers will confuse the parties' marks, this factor also weighs in its favor. Such "an injunction . . . would advance two fundamental purposes of trademark law: preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Lorillard Tobacco*, 453 F.3d at 383.

### E. Security

To obtain a preliminary objection, Rule 65(c) requires a party to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." That determination is committed to the district court's discretion, and the Sixth Circuit has even condoned waiver of a bond based on the strength of the moving party's case. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (collecting cases). The amount of an injunction bond must be sufficient to recompense the enjoined party. *Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982).

Here, Blue Cross has asked for an extraordinary security sum of $5 million, but it has not demonstrated that this sum is equivalent to what its costs and damages would be if it were wrongly enjoined from using its COVANTAGE HEALTH PARTNERS mark. It justifies that demand by pointing to the amounts it spent on promoting its marks, the cost of reregistering its joint ventures, and the expense of coming up with a new name. But those costs consist of $2,000 to $3,000 in

- 28 -

promotions and refiling the organizational papers for three ventures.  This evidence is woefully thin to warrant a bond anywhere near the amount demanded.  A security bond of $10,000 is sufficient.

IV.

The facts presented establish a ripe dispute and show that the plaintiff has alleged an concrete and imminent injury.  The Court has subject matter jurisdiction over this action.  The plaintiff likewise has stated claims for which relief can be granted and has demonstrated a likelihood of success on those claims.  Balancing the pertinent factors favors the issuance of a preliminary injunction.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss (ECF No. 20) is **DENIED**.

It is further **ORDERED** that the plaintiff's motion for a preliminary injunction (ECF No. 7) is **GRANTED**.

It is further **ORDERED** that defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company, its employees, agents, servants, attorneys, coventurers, subsidiaries, related entities, and all those in active concert and participation with them are **RESTRAINED AND ENJOINED** during the pendency of this case, or until further order of the Court, from using in any way any service mark incorporating the term CoVantage, Covantage, or any similar formulation, including, but not limited to, in its signage, marketing materials, business directories, internet and social media content, products, or promotional material.

It is further **ORDERED** that the plaintiff must post a security bond by a surety approved by the Court in the penal sum of $10,000.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 16, 2022